986 F.2d 1260
 1993 A.M.C. 855
 DELTA COUNTRY VENTURES, INC., Plaintiff-Appellant,
v.
Don MAGANA, a minor, California State Board of Control,
California State Reclamation District 551, John Guerry,
William Guerry, Sacramento County Sheriff's Department,
Sacramento County Board of Supervisors, et al., Defendants-Appellees.
 No. 91-15572.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 15, 1992.
Decided Feb. 5, 1993.
 
 Carl J. Calnero, Porter, Scott, Weiberg & Delehant, Sacramento, CA, for plaintiff-appellant.
 Jay W. Jacobs, Dryden, Margoles, Schimaneck, Hartman, Kelly & Jacobs, San Francisco, CA, Stanley K. Jacobs, Los Angeles, CA, for defendant-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before FERGUSON, REINHARDT, and KOZINSKI, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 Delta Country Ventures, Inc. ("Delta") appeals the district court's order dismissing its complaint in admiralty for lack of subject matter jurisdiction. We affirm.
 
 
 2
 * This case arises from an accident which occurred on September 3, 1989, when defendant-appellee Don Magana dove from the deck of Delta's houseboat and struck something under water, sustaining serious injuries. Delta had leased the houseboat to John Guerry for recreational use. Fifteen-year-old Magana was on the boat as a guest. At the time of the incident, the boat was anchored in the Snodgrass Slough, at the convergence of the Sacramento and Mokelumne Rivers. After diving and injuring himself, Magana was pulled from the water and airlifted by a Highway Patrol helicopter to a trauma center in Sacramento. He was diagnosed as quadriplegic.
 
 
 3
 In July 1990, Delta filed a complaint in district court alleging admiralty jurisdiction and seeking exoneration or limitation of liability under 46 U.S.C.App. § 183 et seq. In August 1990, Magana filed a personal injury action in state court against Delta, the Guerrys and various public entities. In October 1990, Magana moved to dismiss Delta's complaint on the ground that the federal court lacked subject matter jurisdiction. The district court found that Delta had not met its burden of showing that the activities resulting in Magana's injuries bore a substantial relationship to traditional maritime activities, and granted the motion. Delta appeals.II
 
 
 4
 The district court's judgment was final, and we have jurisdiction under 28 U.S.C. § 1291.
 
 
 5
 The existence of subject matter jurisdiction is a question of law which we review de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must accept the district court's factual findings on jurisdictional issues unless clearly erroneous. Id.
 
 
 6
 District courts have original and exclusive jurisdiction over any civil case of admiralty or maritime jurisdiction pursuant to 28 U.S.C. § 1333(1). Admiralty jurisdiction is appropriate "when a 'potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity.' " Sisson v. Ruby, 497 U.S. 358, 362, 110 S.Ct. 2892, 2895-96, 111 L.Ed.2d 292 (1990) (quoting Foremost Ins. Co. v. Richardson, 457 U.S. 668, 675 n. 5, 102 S.Ct. 2654, 2658 n. 5, 73 L.Ed.2d 300 (1982)). Here, Delta seeks to invoke admiralty jurisdiction in order to limit its liability to its interest in the houseboat under 46 U.S.C.App. § 183.
 
 
 7
 In Sisson, the Supreme Court stated that "protecting commercial shipping is at the heart of admiralty jurisdiction" and " '[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction.' " Id. at 362, 110 S.Ct. at 2895 (quoting Foremost, 457 U.S. at 675 n. 5, 102 S.Ct. at 2658 n. 5). The Court then set forth a two-step inquiry for determining whether jurisdiction exists: First, we "assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." Id. at 363, 110 S.Ct. at 2896. Second, we ask whether the party seeking to invoke maritime jurisdiction has shown "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." Id. at 364, 110 S.Ct. at 2897.
 
 
 8
 Here, the district court found that the "incident," a diving accident on navigable waters requiring emergency rescue operations, was of the type likely to disrupt commercial activity. The court dismissed the complaint, however, because it found no substantial relationship between the activity giving rise to the incident, in this case diving from the boat, and traditional maritime activity.
 
 
 9
 Delta contends that the district court erred in its definition of the "activity giving rise to the incident." Delta contends that the relevant "activity" is not diving, but rather the mooring or anchoring of the boat in tidal waters and the examination of tidal changes. We find this argument unpersuasive in light of the Supreme Court's reasoning in Sisson :
 
 
 10
 Our cases have made clear that the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose.... This focus on the general character of the activity is, indeed, suggested by the nature of the jurisdictional inquiry. Were courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question. Thus ... we need not ascertain the precise cause of [the incident] to determine what "activity" [the party] [was] engaged in....
 
 
 11
 Id. To define the relevant "activity" as mooring of the boat and ascertainment of tidal changes would be to delve into the merits of the causation issue. We know with certainty that Magana was engaging in the activity of diving when he was injured. It is inappropriate for us to speculate on what ultimately caused his injury. Consistent with Sisson, we believe that aquatic recreation off a pleasure boat was the activity that gave rise to the incident here.[1]
 
 
 12
 We conclude that Delta has not shown a substantial relationship between aquatic recreation off a pleasure boat and traditional maritime activity. Prior to Sisson we, like most other circuits, had established a four-part test to determine whether a substantial relationship to traditional maritime activity existed:
 
 
 13
 (1) traditional concepts of the role of admiralty law;
 
 
 14
 (2) the function and role of the parties;
 
 
 15
 (3) the types of vehicles and instrumentalities involved; and
 
 
 16
 (4) the causation and nature of the injury suffered.
 
 
 17
 E.g., Guidry v. Durkin, 834 F.2d 1465, 1471 (9th Cir.1987). Every circuit to have considered the issue has ruled the four-part test survives Sisson.[2] We join our fellow circuits in holding that the four-part test is still valid, except for the fourth factor's causation inquiry, which is precluded by Sisson, 497 U.S. at 364-65, 110 S.Ct. at 2897. Applying the four-factor test as modified, we conclude that the traditional concepts of admiralty law do not support the assertion of admiralty jurisdiction over the claim of a houseboat guest who sustains personal injuries as a result of his diving off the boat. We conclude that a substantial relationship with traditional maritime activity is lacking.[3]
 
 
 18
 Delta makes a series of circular arguments in an attempt to establish that the relevant activity here was navigation, which is undoubtedly traditional maritime activity. We find the reasoning of Foster v. Peddicord, 826 F.2d 1370 (4th Cir.1987), cert. denied, 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988), to be persuasive. Foster also involved a guest injured after diving off a pleasure boat. The Fourth Circuit rejected an argument similar to Delta's:
 
 
 19
 The injury in this case occurred when [the plaintiff] dove from the boat and hit bottom in shallow water. To conclude that the location where [the defendant] parked his boat constituted "navigational error" and that this in turn was the cause of the injury would reflect neither a reasonable definition of navigation nor common sense.
 
 
 20
 826 F.2d at 1876. Delta goes a step further, straining not just common sense but credulity, by arguing that a diver ascertaining the depth of water before diving is engaged in navigational activity. See Smith v. Knowles, 642 F.Supp. 1137, 1140 (D.Md.1986) ("[T]he defendant's estimate of the water's depth did not affect the navigation of the boat. The defendant might as well have been estimating the depth of a swimming pool.").
 
 
 21
 We agree with the district court's determination that the activity giving rise to the incident in this case bears no substantial relationship to traditional maritime activity.[4] The district court's order dismissing Delta's complaint for lack of subject matter jurisdiction is AFFIRMED.
 
 KOZINSKI, Circuit Judge, dissenting:
 
 22
 This is our first opportunity to define and limit the breadth of admiralty jurisdiction in the wake of Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). It's difficult to imagine a more tragic setting in which to do so. Don Magana, a fifteen year old boy, was permanently paralyzed in an accident he suffered while engaged in the kind of carefree activity enjoyed by many teenagers; Delta Country, the owner of the boat on which he was injured, then invoked federal admiralty jurisdiction to deny him, through the Limitation of Liability Act, the full measure of his damages. But sad as this case may be, we must not forget that the test we adopt for the exercise of admiralty jurisdiction applies not just to Limitation of Liability Act cases but to all admiralty cases in the Ninth Circuit. I fear the compelling facts of this case have led my colleagues to formulate far too narrow a definition of our admiralty jurisdiction.
 
 
 23
 * Although the Limitation of Liability Act gives a vessel owner a cause of action to limit his liability to the value of his boat, 46 App.U.S.C. § 183, it most likely does not provide an independent basis for federal jurisdiction.[1] Rather, to invoke the Act in federal court a shipowner's claim must present a "civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). According to the Supreme Court's most recent interpretation of section 1333, admiralty jurisdiction is proper "when a 'potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity.' " Sisson v. Ruby, 497 U.S. at 362, 110 S.Ct. at 2895-96 (quoting Foremost Ins. Co. v. Richardson, 457 U.S. 668, 675 n. 5, 102 S.Ct. 2654, 2658 n. 5, 73 L.Ed.2d 300 (1982)). To determine whether this requirement is satisfied in a particular case, federal courts must conduct two separate inquiries.
 
 
 24
 A. First we must "determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the actual effects on maritime commerce.... Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." 497 U.S. at 363, 110 S.Ct. at 2896 (emphasis in original). While the majority does not discuss this point, there can be no doubt that Delta fulfilled the first Sisson requirement. The emergency response to Magana's accident required the assistance of a neighboring yacht, the fire department and a rescue helicopter. A diving accident such as this one, which occurred at the intersection of the Sacramento and Mokelumne Rivers--both navigable waterways--posed an undeniable potential impediment to the passage of other boats engaged in maritime commerce.
 
 
 25
 B. The second Sisson inquiry calls for "the party seeking to invoke maritime jurisdiction [to] show a substantial relationship between the activity giving rise to the incident and traditional maritime activity." 497 U.S. at 364, 110 S.Ct. at 2897. The majority defines the relevant activity as "aquatic recreation off a pleasure boat," maj. op. at 1262, rather than more generally as the anchoring and mooring of the boat at the time of the accident. It is here that my colleagues and I part company. I recognize that disputes about the appropriate level of generality always carry with them a certain degree of arbitrariness. But here we are not cast adrift without standards to inform our decision; Sisson provides compelling guidance in resolving this question.
 
 
 26
 Sisson involved a fire that erupted aboard the pleasure vessel Ultorian while she was docked at a marina on Lake Michigan. In deciding whether the relevant activity was a fire in the washer/dryer of a 56-foot pleasure yacht or, alternatively, the docking and maintenance of a boat, the Court said:
 
 
 27
 [T]he relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose.... Were courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question.
 
 
 28
 497 U.S. at 364, 110 S.Ct. at 2897. The majority also quotes this passage, maj. op. at 1262, but goes on to define the relevant activity in the most fact-specific way possible--omitting from the description only that the injured victim's initials were D.M. But by focusing on the minutiae of the incident, rather than the "general conduct from which the incident arose," the majority ignores what the Court actually did in Sisson : It defined the relevant activity as the "storage and maintenance of a vessel at a marina on navigable waters," not as doing the laundry or as installing and maintaining household appliances. 497 U.S. at 365, 110 S.Ct. at 2897. In addition, the Court cited with approval Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), where "the relevant activity was not a plane sinking in Lake Erie, but air travel generally." 497 U.S. at 364, 110 S.Ct. at 2897. Sisson also explained that in Foremost Ins. Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), which involved a freak collision between a ski boat and a bass boat on a river, the "relevant activity [was] navigation of vessels generally." 497 U.S. at 364, 110 S.Ct. at 2897.
 
 
 29
 What we must examine under the second prong of Sisson is whether the injury took place on or about a vessel engaged in traditional maritime activity. The injury in Executive Jet did not, so admiralty jurisdiction did not attach; the injuries in Foremost and Sisson did, so admiralty jurisdiction attached. This does not, as the majority suggests, reinstate the maritime locality test. See maj. op. at 1262 n. 1. Many things that take place on or about vessels wouldn't support admiralty jurisdiction. See, e.g., Penton v. Pomano Constr. Co., Inc., 976 F.2d 636 (11th Cir.1992) (construction worker injured while building a jetty by operating a crane on a barge); David Wright Charter Serv. v. Wright, 925 F.2d 783, 784 (4th Cir.1991) (per curiam) (explosion of boat stored in shed 75-feet away from water); Myhran v. Johns-Mansville Corp., 741 F.2d 1119 (9th Cir.1984) (pipefitter's exposure to asbestos while repairing vessel); Ozzello v. Peterson Builders, Inc., 743 F.Supp. 1302 (E.D.Wis.1990) (construction employee injured by hose while working on deck).
 
 
 30
 It's possible, of course, to define any set of circumstances in a way that will appear to have little or no relationship to traditional maritime activity. Here, a dive off a boat anchored on a navigable waterway becomes "aquatic recreation off a pleasure boat"--nomenclature so stilted it could appear only in a judicial opinion. A jet-skier injured on a river might likewise be said to be involved in "aquatic recreation on a pleasure craft." But see Wahlstrom v. Kawasaki Heavy Indus., Ltd., 800 F.Supp. 1061 (D.Conn.1992). Negligence by emergency personnel in treating an injured riverboat pilot aboard the vessel could be re-cast as "medical malpractice." But see Antoine v. Zapata Haynie Corp., 777 F.Supp. 1360 (E.D.Tex.1991). A passenger hurt while boarding a cruise ship could just as easily be described as "falling down the stairs." But see Jimenez v. Peninsular & Oriental Steam Navig. Co., 974 F.2d 221 (1st Cir.1992); see also Price v. Price, 929 F.2d 131 (4th Cir.1991). A person injured while scuba diving off a boat might be deemed to be engaged only in "recreational underwater sports." But see Sinclair v. Soniform, Inc., 935 F.2d 599 (3rd Cir.1991). And a wiring defect in a space heater which causes a fire aboard a moored pleasure yacht might be described as an "electrical malfunction." But see Unigard Security Ins. Co. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363 (9th Cir.1992) (Ferguson, J.). Had each of these post-Sisson cases been as creative in the use of language as the majority is here, they could all have concluded that there was no admiralty jurisdiction.
 
 
 31
 C. Even were I to accept my colleagues' formulation of the relevant activity, none of the adjectives they employ to distract from the essentially maritime aspect of what happened here makes a bit of difference. Thus, the fact that the vessel here is a "pleasure boat" makes it no less susceptible to maritime jurisdiction than any other vessel. Sisson itself involved a yacht docked in a marina--a pleasure craft among pleasure crafts; and Foremost involved a collision between two recreational boats. For purposes of admiralty jurisdiction a houseboat is no less a boat than an aircraft carrier: "The need for uniform rules of maritime conduct and liability ... extends ... to any other activities traditionally undertaken by vessels, commercial or non-commercial." Sisson, 497 U.S. at 367, 110 S.Ct. at 2898 (emphasis added); see also Foremost Ins. Co., 457 U.S. at 674-75, 102 S.Ct. at 2658. Nor does the fact that Magana was engaged in "aquatic recreation" matter. Passengers on vessels always have purposes unrelated to the maritime aspects of the voyage: They want to take a cruise, go fishing or maybe just get from here to there. Few passengers, if any at all, board a boat for the purpose of engaging in maritime activities. Unless we're willing to say that injuries suffered by passengers on vessels fall outside the ambit of maritime jurisdiction--something we're not free to do under controlling case law--I don't see how we can define what happened here in terms so divorced from the maritime aspects of the incident.
 
 
 32
 The only case the majority can muster in support of its dubious position is Foster v. Peddicord, 826 F.2d 1370 (4th Cir.1987), cert. denied, 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988), which predates Sisson and must be considered overruled to the extent it's inconsistent therewith. No Fourth Circuit case cites or discusses the vitality of Foster after Sisson. The only case to do so is In re Bird, 794 F.Supp. 575 (D.S.C.1992), a Limitation of Liability Act case which involved a drunken partygoer aboard a pleasure yacht who knocked another passenger overboard. While the Bird court recognizing that Foster was "almost identical, factually," 794 F.Supp. at 578, Bird nonetheless concluded that maritime jurisdiction attached after Sisson. Id. at 580-81. It thus appears that we are paying more heed to Foster than are the courts in the Fourth Circuit.
 
 
 33
 While the majority embroiders the nexus inquiry with qualifiers that make the activity sound less maritime, we're still confronted with the fact that Magana was injured when he took a dive from the side of a boat into shallow water. Going into the water off of a vessel has a relationship to even the most traditional definition of maritime activity. The location of the vessel--how far from shore, how close to rocks or shoals--also has very much to do with maritime activity. And the fact that the boat was anchored in the middle of a navigable river is significant, as vessels drop anchor to protect themselves from wind, storms and currents; anchoring also allows repairs and provisioning without the necessity of docking. All of this suggests that the activity here has no less a relationship to traditional maritime activity than the washer/dryer fire in Sisson. It's only through verbal squinting that the majority manages to reach the opposite conclusion.
 
 II
 
 34
 The Limitation of Liability Act is an anachronism, a holdover from the days when encouraging commerce by sea was considered more important than providing full redress to victims of maritime accidents. As I have said before, such a law no longer makes sense. See Esta Later Charters, Inc. v. Ignacio, 875 F.2d 234, 235 & n. 1 (9th Cir.1989). One of the many unfortunate consequences of the Limitation of Liability Act is that it leads courts to contort the law to avoid unjust results: "Misshapen from the start, the subject of later incrustations, arthritic with age, the Limitation Act has 'provided the setting for judicial lawmaking seldom equalled.' " Id. at 239 (citation omitted). If admiralty jurisdiction were relevant only for the Limitation of Liability Act, our decision today would not be so objectionable. But admiralty jurisdiction is invoked in many other settings where such a narrow interpretation is highly undesirable. For example, a plaintiff seeking to sue the United States will invoke the Suits in Admiralty Act, 46 App.U.S.C. §§ 741 et seq., which waives the government's sovereign immunity in "cases where if [the involved vessel] were privately owned or operated ... a proceeding in admiralty could be maintained." 46 App. U.S.C. § 742; see also 46 App. U.S.C. § 781 (Public Vessels Act) (providing a cause of action for injuries on public ships which occur in admiralty jurisdiction). Similarly, plaintiffs may wish to avail themselves of the compensation scheme of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et seq.; injured seamen who sue their employers must rely upon a cause of action created by the Jones Act, 46 App.U.S.C. §§ 688 et seq. Both statutes hinge upon admiralty jurisdiction. See, e.g., Edwards v. Director, OWCP, U.S. Dept. of Labor, 932 F.2d 1325, 1328 (9th Cir.1991); Stanfield v. Shellmaker, Inc., 869 F.2d 521, 523-24 (9th Cir.1989). There are also a variety of common law admiralty doctrines that favor injured parties. See, e.g., United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (contributory negligence not a bar to recovery in admiralty); Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) (shipowner's duty of care unaffected by plaintiff's status); see also Morton v. De Olivera, 984 F.2d 289 (9th Cir.1993) (ship owner is absolutely liable for crewmember's assault on passenger). A narrow reading of Sisson helps Magana but could well frustrate others seeking to invoke the admiralty jurisdiction of the federal courts in this circuit.
 
 
 35
 Although Congress has acknowledged our suggestion that the Limitation of Liability Act be repealed, see S.Rep. No. 94, 101st Cong., 1st Sess. at 4 (1989) (citing Esta Later ), the statute remains on the books, a sad reminder of the power of legislative inertia. Until Congress sees fit to decommission the Act, we're bound to apply it. Incongruous as we may find its outmoded assumptions, we will do more harm than good by gerrymandering our admiralty jurisdiction in an effort to avoid the statute's plain import. Reluctantly, I dissent.
 
 
 
 [1]
 The dissent misunderstands the second prong of Sisson when it suggests that, in determining the relevant activity, we examine "whether the injury took place on or about a vessel engaged in traditional maritime activity." Dissenting op. at 1265. In fact, such an analysis would reinstate the maritime locality test that has been explicitly revised in Sisson and Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 253-61, 93 S.Ct. 493, 497-501, 34 L.Ed.2d 454 (1972)
 
 
 [2]
 Broughton Offshore Drilling, Inc. v. South Cent. Mach., Inc., 911 F.2d 1050 1052 n. 1 (5th Cir.1990); Price v. Price, 929 F.2d 131, 135 (4th Cir.1991) (but focus more generally on composite genre of the tort or its essential elements); Sinclair v. Soniform, Inc., 935 F.2d 599, 602 (3d Cir.1991)
 
 
 [3]
 The dissent is concerned that in finding no sufficient connection between Magana's diving off of an anchored houseboat and traditional maritime activity, we necessarily restrict admiralty jurisdiction in noncommercial cases. This conclusion is not warranted. It does not follow from our decision in this case that noncommercial activities can never meet the "substantial connection" requirement
 
 
 [4]
 Even if we agreed with the dissent that the relevant activity here is mooring a boat in navigable waters, we would still affirm the district court's judgment. The dissent contends that anchoring a boat in the middle of a navigable river is no less a traditional maritime activity than docking and maintenance of a boat at a marina, upon which jurisdiction was predicated in Sisson. Sisson stands for the proposition that there is something special about a marina. 497 U.S. at 367, 110 S.Ct. at 2898. We would do violence to the analysis explicated there to hold that for jurisdictional purposes mooring a boat on a river is equivalent to the docking and maintenance of a vessel at a marina
 
 
 [1]
 The Supreme Court in Sisson left open the issue of whether the Act independently confers jurisdiction, see 497 U.S. at 359 n. 1, 110 S.Ct. at 2894 n. 1, but every circuit that has considered the question has held that it does not. See David Wright Charter Serv. v. Wright, 925 F.2d 783, 785 (4th Cir.1991) (per curiam); Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts, 921 F.2d 775, 780 (8th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 272, 116 L.Ed.2d 224 (1991); Lewis Charter, Inc. v. Huckins Yacht Corp., 871 F.2d 1046, 1052-54 (11th Cir.1989); Complaint of Sisson, 867 F.2d 341, 348-50 (7th Cir.1989), rev'd on other grounds sub nom. Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Delta Country does not argue to the contrary, so we have no occasion to resolve the issue